UNITED STATES of America,
Plaintiff-Appellee,

v.

Don Bruce DUNCAN,
Defendant-Appellant.

No. 80–1459.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1981.

Decided Dec. 3, 1982.

Robert Mann, Mark Green, P.C., Los Angeles, Cal., for defendant-appellant.

---

* Hon. James M. Burns, Chief United States District Judge for the District of Oregon, sitting by designation.

George L. O'Connell, Asst. U.S. Atty., Los Angeles, Cal., argued, for plaintiff-appellee; Charles Pereyra, Asst. U.S. Atty., Los Angeles, Cal., on brief.

Before FLETCHER and ALARCON, Circuit Judges and BURNS *, District Judge.

ALARCON, Circuit Judge:

Don Bruce Duncan, appellant, was convicted in a jury trial of making a false statement to Customs agents, in violation of 18 U.S.C. § 1001. We affirm.

FACTS

At approximately 11:00 P.M. on April 3, 1980, United States Customs Special Agents Darryl M. Henry, Donald K. Shruhan, Jr. and C.K. Lauridsen were on assignment at Los Angeles International Airport. They were to survey and, if necessary, search departing passengers to ensure the compliance of international travelers with federal currency laws.

While observing passengers in the boarding area of Braniff Airlines Flight 923, to Bogota, Colombia, Agent Henry noticed Duncan. The agent, in his declaration submitted in opposition to Duncan's suppression motion, stated that Duncan did not "have the same demeanor as the other passengers and did not appear . . . to be someone looking forward to a trip out of the United States." Henry also noticed that Duncan was traveling alone, not talking to others in the lounge, and that he appeared to be looking for someone. Agent Henry had eight years' experience with Customs. He believed that appellant Duncan met the narcotics/currency violator profile used by Customs to identify potential offenders.

Henry pointed Duncan out to Lauridsen, who had also noticed Duncan's suspicious behavior. The agents decided to question Duncan before he boarded the plane.

At 11:00 P.M., passengers began to board Flight 923. Duncan had passed through the airline checkpoint and was proceeding on the boarding ramp when Henry and Lauridsen stopped him. In his declaration in opposition to Duncan's suppression motion, Officer Henry stated that "At that point, we identified ourselves as United States Customs Special Agents and asked Mr. Duncan if we could ask him a few questions away from the view of the other passengers. Mr. Duncan replied affirmatively. We then went with Mr. Duncan to the upper portion of the boarding ramp which was not being used."

When Lauridsen asked if Duncan had anything to report to Customs prior to his departure, Duncan said "No". In response to inquiries about currency or monetary instruments, Duncan stated that "I know I have to report anything over $5,000, but I have only $5,000." Lauridsen asked Duncan if he had any more currency and Duncan said "No."

Lauridsen asked if he could examine Duncan's shoulder bag, and Duncan agreed. When the search produced nothing, Lauridsen asked to see the $5,000. Duncan produced the $5,000 from his jacket. He said that he was carrying no more currency. Agent Henry stated in his declaration that he "then asked Mr. Duncan if [he] could pat him down to check for additional currency, [Duncan] replied affirmatively."

During the superficial pat-down search, Henry felt a hard object in Duncan's right rear pocket, which turned out to be an additional $5,000 in $100 bills.

At this point, the agents believed that Duncan had violated the Bank Secrecy Act, 31 U.S.C. § 1101(b), because he had failed to report to Customs that he was taking over $5,000 out of the country. Lauridsen advised Duncan that they were going to seize his $10,000 because of the 1101(b) violation, and said "Looks like you'll be missing your flight." Duncan had not yet received Miranda warnings.

When Henry asked Duncan why he had not reported the extra money to Customs, Duncan said he had recently filed his 1979 income tax return without reporting the $10,000 and that he was afraid of the Internal Revenue Service. Agent Henry then "asked Mr. Duncan if he wished me to retrieve his baggage from the aircraft. [Duncan] stated that he did and gave [Henry] his baggage claim checks...."

Agents Shruhan and Lauridsen accompanied Duncan to the Customs Office on the lower level of the airport. Lauridsen processed the seizure of Duncan's money. As he was checking Duncan's identification, he discovered approximately $1,200 in Duncan's wallet. Duncan said that he had forgotten about the extra money in his wallet.

When Henry returned with Duncan's suitcase, he asked Duncan if it was alright to search his luggage for additional currency or other merchandise. [Duncan] stated that it was. Henry found nothing in the suitcase. He then asked Duncan to remove his sweater and undershirt. Duncan did so, and surrendered a blue plastic money belt containing $10,000 to Henry.

Over $21,000 was recovered from Duncan. Three and one-half hours after the detention had begun, Duncan was given his *Miranda* warnings. He then made no further statements.

ISSUES

Duncan contends that there are several errors that require reversal of his conviction. He first contends that his conviction under 18 U.S.C. § 1001 is invalid because his "false statement" to customs agents cannot form the basis of an 18 U.S.C. § 1001 charge. Second, he contends that the stop and search violated the fourth amendment, and therefore all evidence derived from that search is inadmissible. Third, he contends that his statements are inadmissible because they were made during custodial interrogation but before *Miranda* warnings were given. Finally, he contends the trial court's rulings on discovery, jury instructions and the court's evidentiary rulings were in error, and require reversal.

*18 U.S.C. § 1001 COUNT*

Duncan claims that his false statement to customs officials—that he knew the reporting requirement but was carrying only $5,000—cannot form the basis of an 18 U.S.C. § 1001 conviction because: (1) there is a more narrowly drawn statute which specifically prohibits his conduct; (2) Duncan's statement was not material within the meaning of § 1001; and (3) Duncan's statement fell within the "exculpatory no" exception to § 1001. We find no merit in any of these contentions.[1]

### 1. Narrowly Drawn Statute

Duncan contends that 18 U.S.C. § 1001 is a "catch-all" false statement statute which cannot be applied to a defendant's conduct if a more specific, narrowly drawn statute prohibits the same conduct. Duncan claims that the currency reporting statutes, 31 U.S.C. §§ 1058 and 1101[2], are applicable in this case, and therefore preclude application of 18 U.S.C. § 1001. We disagree.

 There is no reason that Duncan cannot be charged and convicted under 18 U.S.C. § 1001 simply because another statute is also applicable.[3] Often a course of criminal conduct will entail the violation of several statutes. In those cases, if the statutes are not redundant,[4] the prosecutor may charge the defendant with violating one or all of the statutes, and the defendant can be convicted of violating more than one statute. *See United States v. Moore,* 638 F.2d 1171 (9th Cir.1980) (defendant convicted of violating both 18 U.S.C. § 1001 and 31 U.S.C. § 1101.) Thus, the 18 U.S.C. § 1001 count was proper.

### 2. Materiality of Duncan's Response

 Duncan contends that his statement —"I know I have to report anything over $5,000, but I have only $5,000"—is not material within the meaning of § 1001, and therefore cannot constitute the basis of an 18 U.S.C. § 1001 conviction. We disagree. This court has held that a statement satisfies the materiality requirement of 18 U.S.C. § 1001 if "the false statements [could] have affected or influenced the exercise of a governmental function." *United States v. Goldfine,* 538 F.2d 815, 820 (9th Cir.1976).

---

1. 18 U.S.C. § 1001 provides:

 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 31 U.S.C. § 1058 provides:

 "Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned not more than one year, or both."

 31 U.S.C. § 1101 provides in pertinent part:

 (a) Except as provided in subsection (c) of this section, whoever, ... knowingly—

 (1) transports or causes to be transported monetary instruments—

 (A) from any place within the United States to or through any place outside the United States ... in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with Subsection (b) of this section.

3. In *United States v. Masters,* 612 F.2d 1117, 1122 (9th Cir.1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 134, 66 L.Ed.2d 57 (1980), this court held that a defendant was properly convicted under 18 U.S.C. § 1001, despite the fact that the customs agents' first dealings with the defendant were under the currency reporting statutes. *Accord United States v. Fitzgibbon,* 576 F.2d 279, 283 (10th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978).

4. Duncan contends that this court, in *United States v. Rose,* 570 F.2d 1358 (9th Cir.1978), held that a person cannot be convicted of violating 18 U.S.C. § 1001 when a more narrow and specific statute covering the same alleged misconduct exists. Duncan misreads *Rose.* In *Rose* the § 1001 conviction was invalid because it was redundant. The defendant in *Rose* was convicted of violating both 18 U.S.C. § 542 and § 1001. The court concluded the counts were redundant because every element of § 1001 was an element of § 542. *Id.* at 1363. In the instant case, there is no redundancy—both because 31 U.S.C. §§ 1058 and 1101 and 18 U.S.C. § 1001 are not the same, and because Duncan was convicted only of violating § 1001.

In *United States v. Carrier,* 654 F.2d 559 (9th Cir.1981), this court held that a response of "no" to a customs inquiry of whether a person was bringing over $5,000 into the United States was material within the meaning of 18 U.S.C. § 1001. The *Carrier* court stated:

> Appellant's claim · that his oral answer "No" was not a material statement is meritless. The test for determining the materiality of the falsification is whether it is: (1) one that could affect or influence the exercise of governmental functions; (2) does it have the natural tendency to influence or is it capable of influencing agency decision? . . . Beyond question, the statement "No" could very well affect the exercise of governmental functions and agency decisions since it would have a tendency to prevent Customs from fulfilling their administrative duty to require persons entering the United States to file a currency reporting form in accordance with 31 U.S.C. § 1101." *Id.* at 561–62 (citations omitted.)

*Carrier* is not distinguishable from the instant case. The only difference in the two cases is that while Carrier was entering the United States, Duncan was leaving.[5] In both instances Customs has a duty to enforce reporting laws, and in both instances, a false answer could impair Customs' ability to function. We therefore find Duncan's statement to be material within the meaning of 18 U.S.C. § 1001.

### 3. *"Exculpatory No" Exception*

■ Duncan contends that his false statement that he had only $5,000 cannot be used to convict him under § 1001 because a "yes" response to the inquiry of Custom's agents would have tended to incriminate him; Duncan contends he was therefore entitled to respond with an "exculpatory no." Duncan is mistaken. In *United States v. Moore,* 638 F.2d 1171, 1175–76 (9th Cir.1980), this court explicitly held that any affirmative statement in response to a Customs agent's inquiry can form the basis of a § 1001 conviction. In response to the "exculpatory no" argument, the *Moore* court stated: "It is doubtful whether the 'exculpatory "no".' defense has any validity within this Circuit. . . . We need not reach the issue, however, because appellants did more than merely say no, they had nothing to declare; they offered . . . affirmative, unsolicited statements. . . ." *Id.* at 1176. *Moore* is controlling here. Duncan did more than merely say no—he offered the affirmative statements that he knew the reporting requirements, and that he had only $5,000. These statements are sufficient to form the basis of a § 1001 conviction. *See also United States v. Carrier,* 654 F.2d 559, at 561 (9th Cir.1981) (response of "no" to inquiry of whether defendant was carrying over $5,000 into the United States is sufficient to form a basis of 18 U.S.C. § 1001 conviction).

### STOP AND SEARCH

Duncan filed a pretrial suppression motion challenging the actions of customs officers at the airport on fourth and fifth amendment grounds. The trial court denied the suppression motion.

On appeal, Duncan argues that the stop and search as he was preparing to board his plane violates his fourth amendment rights because customs agents had no warrant and no probable cause.[6] We find the search was valid as a border search.[7]

---

5. Duncan contends that this court has held similar statements material when one seeks to enter the United States only because in those cases one is seeking the privilege of entry, and that makes this case distinguishable. We are cognizant of the fact that *U.S. v. Rose,* 570 F.2d 1358, 1364 (9th Cir.1978), mentioned that a defendant was seeking the privilege of entry in finding a statement material within § 1001. We, however, do not believe that is a significant distinction. The key to § 1001 materiality is a statement's ability to impair governmental functions. For the reasons noted in the text, Duncan's statement could impair governmental functions, and, therefore, it is material.

We also find Duncan's "right to travel" argument without merit. A customs inquiry does not infringe on the right to travel.

6. The government contends that Duncan consented to the stop and search, and therefore the fourth amendment is not violated. Because we find the search valid as a border search and see

This Circuit has clearly held that a person leaving the United States may be stopped and searched, without probable cause or any suspicion, pursuant to border search principles. *United States v. Stanley,* 545 F.2d 661, 666–67 (9th Cir.1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *see also California Bankers Assn. v. Schultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974) (the Supreme Court stated in dictum that no violation of the fourth amendment occurs when those entering and leaving the country are "examined as to their belongings and effects"); *United States v. Swarovski,* 592 F.2d 131, 133 (2nd Cir.1979) (no violation of the fourth amendment occurs when there is a warrantless search of the luggage belonging to a person about to leave the country). The first question here is whether Duncan was at a border when he was stopped.

In this era of air travel, it is unreasonable to expect that persons can be searched at the exact moment they cross an international border. One will board a plane at a place within the interior borders of one country and not touch ground again until within the interior borders of a second country. Because of this, courts have recognized the validity of border searches at what are referred to as the "functional equivalent" of a border. *See Almeida-Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) ("a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search"). *See also United States v. Moore,* 638 F.2d 1171, 1173 (9th Cir.1980).

Here Duncan was stopped while he was proceeding up the ramp to board a plane bound for Bogota, Colombia. We think that the point at which he was stopped was the "functional equivalent of a border." *See United States v. Cutaia,* 511 F.Supp. 619, 625 (E.D.N.Y.1981) (search of passengers while waiting to board aircraft for international flight is a search at the border). To require that a passenger board a plane before allowing a customs stop is unreasonable. It is enough that the passenger manifest a definite commitment to leave the United States and that the search occur in reasonable temporal and spatial proximity to the departure. *See id.* Duncan, by checking his luggage, passing through the airline checkpoint, obtaining a boarding pass, and proceeding up the ramp had manifested a definite commitment to leave the country.

Since this was a search at a "border", of a person leaving the country, there is no need for probable cause, warrants or even suspicion. *United States v. Stanley,* 545 F.2d at 655. *See also United States v. Ajlouny,* 629 F.2d 830, 834 n. 3 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981). Rather, the search comports with the fourth amendment unless it violates "reasonableness". *See United States v. Guadalupe-Garza,* 421 F.2d 876, 878 (9th Cir.1970). Reasonableness, when used in the context of a border search, is "incapable of comprehensive definition or of mechanical application...." *Id.* The scope of the intrusion, the manner of its conduct, and the justification for its initiation must all be considered in determining whether a search comports with reasonableness.

no reversible error committed during the stop, search, or questioning, we need not decide whether Duncan, in fact, consented to the stop and search.

7. Duncan argues that a border search is improper unless there is some statute authorizing the search. As support Duncan cites *United States v. Williams,* 617 F.2d 1063, 1074 (5th Cir.1980) (en banc). Duncan misreads *Williams. Williams* analyzes the power to search without warrant, and says in some cases a statute will be the source of the authority to search. *Williams* continues, however, to say "that the source of authority for a seizure or search *need not be statutory....*" *Id.* at 1074 (emphasis added). A search made at a border is justified by the need of the sovereign to protect itself. *See United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). Of course, the search must also comport with constitutional principles.

■ The search of Duncan comports with reasonableness in both scope and conduct. In the initial stages of the search only Duncan's carry-on baggage, pockets, and wallet were searched, and he was superficially patted down. This does not involve a serious invasion of personal privacy and dignity. Although he was later required to remove his sweater and undershirt,[8] it was conducted only after agents had recovered over $5,000—the maximum that can be exported without a declaration. This excess currency created the real suspicion necessary for a strip search. *See United States v. Palmer,* 575 F.2d 721, 723–24 (9th Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978).

Moreover, there is no indication that the manner in which this search was conducted was unreasonable. The length of the search was no longer than necessary to ensure no laws were violated—although the stop eventually stretched to over three hours, most of this time was after agents had evidence Duncan had violated the law, and thus had cause to detain him. The search was conducted out of the public view, initially on a deserted boarding ramp and later in a room, thus ensuring that Duncan would not be embarrassed by the stop and search.

■ Duncan argues, however, that this search as he was leaving the United States is not reasonable because he did not have any notice that he was subject to a border search. He notes that searches while exiting the United States are not expected by travelers, and that the percentage of persons searched exiting is less than those searched entering. These searches, he claims, are particularly disruptive because of their novel and unexpected character. Duncan, however, has cited no authority to support his contention that notice is necessary. Even if notice is necessary, this court has held that a person exiting the United States has constructive notice that he or she is subject to search. In *United States v. Stanley,* 545 F.2d 661 (9th Cir.1976), this court upheld a border search of a boat leaving the United States. The *Stanley* court wrote, in upholding exiting searches, that "[a] person leaving the country belongs to a class whose members sometimes violate certain laws in leaving. On crossing a border, *he is on notice that a search may be made....*" *Id.* at 667 (emphasis added) (footnote omitted). We think it reasonable to conclude that a person, about to board a plane for a non-stop trip to a foreign country, is on notice that he or she is at the functional equivalent of an international border. It is at or before this point that a person is required to declare to customs that he or she is transporting certain items out of the United States, not at the point of actual border crossing.

■ Finally, we do not find any merit in Duncan's claim that the search is unreasonable because he was the only passenger stopped. As we noted above, customs agents have the power to make searches of exiting persons. However, the existence of this power does not require that it be exercised on all persons leaving the United States. There are many reasons, fiscal, administrative and others, why customs might not search all exiting individuals. Duncan does not argue that he was singled out for impermissible reasons.

## MIRANDA

Duncan contends that admitting his statements to customs agents made after he was stopped and before he was given *Miranda* warnings constitutes reversible error.

---

8. Duncan refers to this as a strip search. It is not clear whether he was required to remove more than just his upper garment, however, and thus questionable whether this was in fact a strip search. It is, however, reasonable even if considered a strip search. For example, in *Henderson v. United States,* 390 F.2d 805 (9th Cir.1967), this court, in determining whether a border search was reasonable, held that while no suspicion is required for the border search of a person, his or her baggage, vehicle, purse, wallet or pockets, at least real suspicion is necessary for a strip search, and some clear indication that contraband will be found is required for a body cavity search because such a search is "a serious invasion of personal privacy and dignity...." *Id.* at 808.

He argues that he was subjected to custodial interrogation from the time he was stopped and thus entitled to *Miranda* warnings, and because the statements were made before the warnings were given, they were inadmissible, and their admission was prejudicial. We disagree.

Duncan's suppression claim centers on two statements. The first statement "I know I have to report anything over $5,000, but I have only $5,000" was made in response to an inquiry of whether Duncan had anything to report to customs. At the time this statement was made, the agents had no evidence that Duncan had committed a crime, nor any probable cause to arrest him for any crime.

The second statement, that Duncan had concealed the money to avoid problems with the IRS, was made after the agents discovered the second $5,000. The agents, at the time the second statement was made, had evidence of a crime,[9] and probable cause to arrest for that crime.

This court has often considered the problem of *Miranda* warnings in the context of border searches. It is the rule of this Circuit "that *Miranda* warnings need not be given in border crossing situation 'unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense.'" *United States v. Estrada-Lucas,* 651 F.2d 1261, 1265 (9th Cir.1980) (quoting *Chavez-Martinez v. United States,* 407 F.2d 535 (9th Cir.), *cert. denied,* 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969). *See also United States v. Espericueta-Reyes,* 631 F.2d 616, 621–22 (9th Cir.1980).

As we noted above, the agents here had no probable cause to believe Duncan committed an offense when he made the first statement, that he knew the reporting requirements but had only $5,000. Thus, there was no need for *Miranda* warnings at that time. It was not until later that the second $5,000, which provided the basis for the probable cause, was discovered.

When Duncan made the second statement, however, the agents had recovered $10,000 from Duncan, and they therefore had probable cause to believe Duncan had committed at least one offense. At the time the second $5,000 was recovered, the officers were required by Miranda to advise Duncan of his constitutional rights.

We, however, will not reverse a conviction because of erroneous admission of statements made in violation of the defendant's *Miranda* rights if the admission of the statement was harmless beyond a reasonable doubt. *United States v. Casimiro-Benitez,* 533 F.2d 1121, 1124–25 (9th Cir.), *cert. denied,* 429 U.S. 926, 97 S.Ct. 329, 50 L.Ed.2d 295 (1976).

The admission of the statement referring to the IRS was harmless beyond a reasonable doubt. Duncan's false statement that he was carrying only $5,000, was properly admitted. That statement, combined with physical evidence obtained in the search of Duncan, provided sufficient independent evidence of guilt beyond a reasonable doubt.

REMAINING CONTENTIONS

Duncan's remaining contentions, that he was erroneously denied discovery, that the trial court erred in instructing the jury, that there was error in admitting prior consistent statements of agent Lauridsen, and that the court erred in restricting Duncan's presentation of evidence are without merit.

A. *Discovery*

Duncan contends that the trial court committed reversible error in denying his motions for discovery of the customs narcotics/currency violator profile and the customs enforcement standards. Duncan cites no authority to support his contentions and we have found none. We will not reverse a district court's discovery ruling unless there is a showing that the court abused its discretion, resulting in prejudice to the defendant's substantial rights. *United States v. Arguelles,* 594 F.2d 109, 112

---

**9.** At this point the agents had probable cause to believe that Duncan violated both 31 U.S.C. § 1058 (reporting requirements) and 18 U.S.C. § 1001 (false statements).

(5th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979). Duncan has made no such showing.

■ Duncan also contends he was denied discovery of his statements. Under Rule 16 of the Federal Rules of Criminal Procedure, a defendant is entitled to discovery of all his relevant statements upon request. There is no indication here that Duncan had not given all of his statements or that Rule 16 was not complied with. We have been presented with no basis on which to disturb the trial court's ruling.

### B. *Jury Instructions*

■ The trial court instructed the jury that until proven otherwise everyone is presumed to know the requirements of the law. Duncan claims that the giving of this instruction was reversible error. We disagree.

On appeal, jury instructions must be reviewed as a whole to determine their legal sufficiency. *United States v. Ponticelli,* 622 F.2d ,985, 990 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). Here, the jury was instructed that Duncan had to knowingly and willfully make a false statement to government officials before they could find him in violation of § 1001. Taking the instructions as a whole, we find no error.

### C. *Agent Lauridsen's Prior Statements*

■ Duncan claims that the court improperly admitted into evidence three "prior consistent statements" made by Agent Lauridsen. Lauridsen testified that Duncan had admitted knowing that he had to report currency in excess of $5,000 to Customs before leaving the country. The notes which Lauridsen made during his first official interview with Duncan did not include this admission. The government introduced Lauridsen's prior consistent statements to rebut the implication by Duncan's attorney on cross-examination that Lauridsen had fabricated Duncan's admission after the initial interview. Duncan argues that the statements were not exceptions to the hearsay rule because they did not meet the requirements of Fed.R.Evid. 801(d)(1)(B) and that their admission was reversible error.

The trial court has broad discretion regarding the admission of prior consistent statements. *United States v. Mock,* 640 F.2d 629, 632 (5th Cir.1981). In the present case, the government offered Lauridsen's prior consistent statements in an attempt to rehabilitate him as a witness. Under the circumstances, the admission of prior consistent statements was entirely appropriate. *See United States v. Allen,* 579 F.2d 531, 533 (9th Cir.), *cert. denied,* subnom. *Mitchell v. United States,* 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d 329 (1978). We find no error in the court's ruling.

### D. *Evidentiary Ruling*

■ Similarly, the trial court has broad discretion in conducting a trial, including the examination of witnesses. *See United States v. Salsedo,* 607 F.2d 318, 321 (9th Cir.1979). *See* Fed.R.Evid. 611(a). We find no abuse of discretion in the court's ruling sustaining the government's objection to the question put to Duncan by his attorney "If you had known that all you had to do was file a Form 4790 in order to take all your money out of the country, would you have done so?" The jury also had already heard Duncan's previous testimony that he believed taking over $5,000 out of the country was against the law. They had had ample opportunity to evaluate Duncan's familiarity with the Bank Secrecy Act and its reporting requirements.

The judgment is AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

Because I disagree with two important aspects of the majority's opinion, I must respectfully dissent.

### I. *Legality of the Stop and Search of Duncan.*

I find the majority's approach to the question of the legality of the stop and seizure in this case flawed in several respects.

The first question in assessing the validity of a search conducted by federal officials must be whether the official in question is acting pursuant to some statutory or other authority. Only if some purported authority is shown must we continue to the second question, that is, whether the grant of authority for the search is itself consistent with the fourth amendment and thus constitutional. The Supreme Court has repeatedly employed this two-step analysis. *See, e.g., United States v. Ramsey,* 431 U.S. 606, 615, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *United States v. Brignoni-Ponce,* 422 U.S. 873, 876–78, 95 S.Ct. 2574, 2577–78, 45 L.Ed.2d 607 (1975).

In *United States v. Williams,* 617 F.2d 1063, 1074 (5th Cir.1980) (en banc), the Fifth Circuit discussed the correct procedure for inquiry concerning a search by federal officials. The court concluded that a search carried out by such officials in the absence of authority is unconstitutional per se. "[I]f the Government can point to no authority for a challenged search or seizure, a court must conclude, without any further consideration, that the search and seizure was unconstitutional." *Id.*

The majority fails to acknowledge the need for some grant of authority before *any* federal search can be legal, and does not identify any authority for the search undertaken here. Although it correctly cites *Williams* for the proposition that "the source of

authority for a seizure or search *need not be statutory,*" at 977 n. 7, the majority is wrong in reading the statement to mean that *no* authority is required. *Williams* was a case that involved a question concerning the propriety of the Coast Guard's warrantless search of a Panamanian-registered vessel in international waters. 617 F.2d at 1070–71. The statement quoted by the majority was plainly premised upon Supreme Court dicta in *Ramsey* to the effect that under some circumstances, authority for searches may be derived from inherent Executive authority. The factual context of *Williams* reveals that the type of Executive authority referred to was the President's plenary power to conduct foreign affairs.[1] The status of the Executive as the nation's sole representative in foreign affairs has long been held to justify Executive action where international relations are concerned even without statutory authority. *See United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). Under the facts of the present case, involving a search of an American citizen as he leaves the United States, there can be no plausible claim that the Customs Service acted pursuant to the Executive's authority over international affairs, nor does the majority attempt any such justification.[2]

Any power to conduct the search involved in the present case must be derived from 31 U.S.C. § 1105 (1976),[3] that grants the Cus-

---

1. See, for example, the extensive discussion in *Williams* of the international law considerations raised by the circumstances of the search and seizure in that case. 617 F.2d at 1089–90 (majority opinion); *id.* at 1090–93 (concurring opinion).

2. Without attempting to specify any source of authority for the search conducted in this case, the majority suggests that "a search made at a border is justified by the need of the sovereign to protect itself," at 977 n. 7, citing *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). This attempted justification cannot succeed, since the present case concerns the propriety of a search of a person *leaving* rather than entering the country. While it is hardly necessary to elaborate the illogic of a suggestion that searches of travelers leaving the United States are necessary to insure this country's safety, it is worth noting that the cited passage in *Ramsey* itself

incorporates this distinction. It states that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing *into this country,* are reasonable simply by virtue of the fact that they occur at the border...." 431 U.S. at 616, 97 S.Ct. at 1978 (emphasis added).

More fundamentally, the majority ignores the fact that *Ramsey* did not address the "border search" exception to the fourth amendment at all until it had first determined that "the search ... was plainly authorized by ... statute." *Id.* at 615, 97 S.Ct. at 1978. The majority in this case has made no such determination.

3. 31 U.S.C. § 1105 (1976) provides that,

(a) If the Secretary has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this

toms Service explicit authority to search travelers for unreported currency. The majority fails to address an essential question in this case, that is, whether section 1105 permits a random, warrantless search of a person leaving the U.S. to determine if that person is carrying unreported currency in excess of $5,000. Section 1105(a) provides that,

If the Secretary [of the Treasury] has reason to believe that monetary instruments are in the process of transportation and with respect to which a report filed under section 1101 of this title [requiring disclosure of currency in excess of $5,000] has not been filed or contains material omissions or misstatements, he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of . . .

(1) One or more designated persons.

On its face, this provision plainly requires federal officials, including Customs agents, to obtain a warrant based on probable cause prior to conducting any search of a suspected currency carrier. It is arguable that

title has not been filed or contains material omissions or misstatements, he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of any or all of the following:

(1) One or more designated persons.
(2) One or more designated or described places or premises.
(3) One or more designated or described letters, parcels, packages, or other physical objects.
(4) One or more designated or described vehicles.
Any application for a search warrant pursuant to this section shall be accompanied by allegations of fact supporting the application.
(b) This section is not in derogation of the authority of the Secretary under any other law.

4. 19 U.S.C. § 482 (1976), the principal section authorizing customs searches, is limited to searches of persons "on whom [the Customs Service] shall suspect there is merchandise which . . . shall have been *introduced into the United States* in any manner contrary to law." (emphasis added.)

section 1105(b), which states that "[t]his section is not in derogation of the authority of the Secretary under any other law," may affect this conclusion. However, as noted above, there is no "other law" that specifically authorizes the Customs Service to search *outgoing* travelers upon less than probable cause.[4] In the absence of such specific statutory authority, a section 1105(a) warrant is required in order to search an outbound traveler for the purpose of discovering undeclared currency.

The legislative history to section 1105[5] provides persuasive evidence that Congress did not intend to allow warrantless searches of persons leaving the country. It comes in the supplemental statement of four senators on the Senate Committee on Banking and Currency, the committee that drafted section 1105. These senators commented that,

The bill considered by the committee contained a provision, the enforcement of which would have required the opening of mail and searches of individuals leaving the United States. The committee wisely amended this provision to require that a

I can find no other statute that purports to authorize a random, warrantless search of a traveler leaving the country.

5. The main Senate Report describes section 1105 as follows:

The Secretary is given authority to conduct searches to enforce compliance provided he first obtains a search warrant from any court of competent jurisdiction upon a showing of probable cause. The purpose of the warrant is to avoid an excessive burden on persons entering or leaving the country. However, nothing in the bill would limit the authority of the Secretary to conduct searches under existing law. Should unreported currency be discovered pursuant to a search by the Bureau of Customs under its existing legal authority, the person transporting the currency would be subject to the penalties under this legislation *if the discovery of the unreported currency was incidental to the main purpose of the search.*

S.Rep. No. 1139, 91st Cong., 2d Sess. 7 (1970) (emphasis added). Here, possible discovery of unreported currency was the main purpose of the stop and search of *Duncan.* The Senate Report strongly suggests that Congress did not intend the section 1105(b) "other law" exception to sanction a warrantless search of this kind.

search warrant be secured before any search could take place, thus protecting tourists and other travelers from unnecessary invasion of personal privacy.

S.Rep. No. 1139, 91st Cong., 2d Sess. 19 (1970) (supplemental views of Senators Bennett, Tower, Goodell, and Packwood).[6] This passage demonstrates that the senators who drafted section 1105 did not believe that persons leaving the country could be subjected to random warrantless searches under existing law, and intended to require search warrants for searches of outgoing travelers suspected of currency violations. The majority therefore commits a serious error when it concludes that the Customs Service is authorized to search departing travelers.[7]

The majority would legitimize a random, warrantless search of a traveler leaving the United States against fourth amendment challenge solely on the basis of the so-called "border search" exception to the fourth amendment, as articulated in *United States v. Tilton,* 534 F.2d 1363, 1364–65 (9th Cir. 1976).

The border search exception is founded upon certain peculiar attributes of such searches. As noted above, the Supreme Court has explained that warrantless border searches may lawfully be made "pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). Warrantless searches conducted at established customs search areas and border checkpoints are also deemed consistent with the fourth amendment in part because travelers have notice of the checkpoint and its location; the stops and searches have the appearance of being regular and authorized; officers in the field are not exercising unfettered discretion in deciding who is to be stopped; and the element of embarrassment and humiliation present in random individual stops is absent. *Compare United States v. Martinez-Fuerte,* 428 U.S. 543, 549, 96 S.Ct. 3074, 3079, 49 L.Ed.2d 1116 (1976) (stops at fixed checkpoints require no cause) *with United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975) (reasonable and articulable suspicion required to justify "roving patrol" stops near border). *See also Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (random stops of motorists without cause violate fourth amendment); *International Ladies' Garment Workers v. Sureck,* 681 F.2d 624, 640–41 (9th Cir.1982) (discussing similar issue).

None of these considerations underlying the constitutionality of warrantless border searches applies to the search involved in the present case. As the court in *Ramsey* itself recognized, the sovereign prerogative of defense applies only to justify scrutiny of *incoming* travelers, not of departing ones. Further, there was no limit on the discretion of the Customs agents as to when and where they might perform the currency search involved here. Nothing in the record of this case indicates that such stops are routine or expected. Duncan was singled out solely on the basis of his supposedly suspicious appearance, and there was no visible or regularized checkpoint at which he could know he might be stopped. Thus, the argument that a warrantless search is permissible at a border or its "functional

---

**6.** The history of section 1105, referred to by the senators, is significant. The provision was present in the initial Senate version of the bill, but *not* in the version enacted by the House. *See* 116 Cong.Rec. 16970 (1970). The House later agreed to the Senate provision in conference committee without significant comment. *See* H.R.Conf.Rep. No. 1587, 91st Cong., 2d Sess. 27 (1970), U.S.Code Cong. & Admin.News 1970, p. 4394.

**7.** It is interesting to note the Fifth Circuit's position regarding this issue, recently expressed in *United States v. Rojas,* 671 F.2d 159 (5th Cir.1982). In affirming the conviction of a woman searched as she prepared to leave the country, the court refused to decide whether either section 1105 or, more generally, the fourth amendment, permits warrantless "border searches" of departing travelers. *Id.* at 164.

Instead, it rested its decision on the fact that the defendant had *consented* to the search, thereby making the search one "authorized under existing law" within the meaning of section 1105. *Id.* at 166–67.

equivalent" because a traveler has notice that he may be searched certainly does not apply to the present case. I need not decide whether or under what circumstances departing travelers can be searched upon less than probable cause, to conclude that the search method chosen by the Customs Service in this case is inconsistent with the fourth amendment.[8] On both statutory and constitutional grounds, I would rule that the stop of Duncan was illegal and that the statements obtained from him as a fruit of that stop should have been suppressed.

## II. Applicability of 18 U.S.C. § 1001.

I also disagree with the majority's conclusion that 18 U.S.C. § 1001 (1976) applies under the circumstances of this case to punish the appellant. The majority characterizes Duncan's claim as an assertion that 31 U.S.C. §§ 1058 and 1101 *preclude* application of 18 U.S.C. § 1001 to convict him for his statements. The more basic question, that I would resolve in the appellant's favor, is whether 18 U.S.C. § 1001 was ever intended by Congress to apply to the appellant's statement in the first place.[9]

18 U.S.C. § 1001 is a statute that, taken literally, encompasses a very broad range of conduct.[10] Its blanket prohibition of false statements would seem to punish, for example, a person who wrongly identifies himself to an FBI agent who comes to the door to

---

**8.** My conclusion is in disagreement with the Second Circuit, which has approved warrantless searches of the luggage of a departing traveler, *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979), and of containers destined for export, *United States v. Ajlouny,* 629 F.2d 830, 833–34 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981). These decisions rely in my view unjustifiably on an off-hand piece of dictum in *California Bankers Assn. v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974) ("if those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment, we see no reason to invalidate the Secretary's [reporting] regulations here"). The Second Circuit's reading of *Shultz* is inconsistent with the Supreme Court's decisions in *Delaware v. Prouse, Brignoni-Ponce,* and *Martinez-Fuerte,* all noted *supra.* Border or no border, the Supreme Court has never authorized random, warrantless stops or searches of departing travelers.

Both the majority and the Second Circuit have relied heavily upon *United States v. Stanley,* 545 F.2d 661 (9th Cir.1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), to support their conclusion that probable cause and a warrant are unnecessary for a departure search. *See Ajlouny,* 629 F.2d at 834 n. 3. However, *Stanley* is a special case. *Stanley* was concerned with the legality of a stop and search by the Coast Guard, on reasonable and articulable suspicion falling short of probable cause, of a vessel crossing from United States waters into international waters. 545 F.2d at 663–64. Under these circumstances, the stop and search involved could and should have been upheld not as a border search but as a search conducted pursuant to the specially strong interest of the Executive in securing international waters contiguous to the United States. In such waters, any reasonable suspi-

cion that contraband or evidence of criminal activity will be found is enough to justify a stop. *Cf. United States v. Williams,* 617 F.2d 1063, 1087 (5th Cir.1980) (en banc). Such a reasonable suspicion plainly existed under the facts of *Stanley. See* 545 F.2d at 667 (Kilkenny, C.J., concurring).

**9.** The majority correctly notes that three previous Ninth Circuit cases have affirmed 18 U.S.C. § 1001 convictions for false statements regarding unreported currency carried into the country. These cases are *United States v. Carrier,* 654 F.2d 559 (9th Cir.1981); *United States v. Moore,* 638 F.2d 1171 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); and *United States v. Masters,* 612 F.2d 1117 (9th Cir.1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 134, 66 L.Ed.2d 57 (1980). However, none of these cases addressed the statutory considerations which in my view should properly control the issue. *See United States v. Anderez,* 661 F.2d 404, 408 n. 13 (5th Cir. 1981) (citing *Moore* as Ninth Circuit authority on statutory issue, but acknowledging that our circuit has not confronted the issue squarely). Therefore, I believe that these precedents are properly open for reconsideration in light of Duncan's statutory claim.

**10.** The section provides that,

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

serve a subpoena. Such a false statement differs little, in terms of materiality, moral culpability, or potential for misleading government officials, from the one involved in the present case. Yet in *United States v. Bedore,* 455 F.2d 1109 (9th Cir.1972), this court held that section 1001 cannot be used to punish this false statement, as a literal reading would suggest. Instead, the court examined the purpose and history of section 1001 and concluded that,

> The statute was not intended to embrace oral, unsworn statements, unrelated to any claim of the declarant to a privilege from the United States or to a claim against the United States, given in response to inquiries initiated by a federal agency or department, except, perhaps where such a statement will substantially impair the basic functions entrusted by law to that agency. . . .
>
> Therefore, Bedore's false statement of identity given to [the federal officer] is outside the scope of section 1001.

455 F.2d at 1111 (citations omitted). *Bedore* requires a more thorough examination of the applicability of section 1001 than the majority has undertaken.

Plainly, the statements used to convict Duncan in this case did not threaten to "substantially impair the basic functions entrusted by law" to the Customs Service. The Customs Service did not rely in any way upon the contents of the statements in question. *Cf. Bedore,* 455 F.2d at 1111 ("Typical of the kind of statements that are within the purview of section 1001 are false reports that may engender groundless federal investigations."). Rather, Duncan's statements were elicited in response to formal questions preceding a search that the agents evidently intended to perform no matter what the response.

The structure of the Currency Reporting Act strongly suggests that Congress did not believe or intend that section 1001 apply to punish false declarations regarding currency. 31 U.S.C. § 1101 (1976) states in part that "whoever . . . knowingly [transports monetary instruments into or out of the United States] in an amount exceeding $5,000 on any one occasion shall file a report [detailing the amount of such money and its destination]." Had Congress considered section 1001 to be applicable to persons who fail to comply with this requirement, it would not have added a separate penalty for such violators. In fact, however, Congress enacted 31 U.S.C. § 1058 (1976), that provides, "whoever willfully violates any provision of this chapter [including section 1101] shall be fined not more than $1,000, or imprisoned not more than one year, or both." Significantly, this penalty is a great deal lighter than the 18 U.S.C. § 1001 penalty (maximum of five years in prison and a $10,000 fine) that was applied to Duncan in the present case. Congress would not have provided for this specific penalty had it intended section 1001 to apply to violators of the new currency reporting statute when it was passed in 1970.

The only conceivable, but basically implausible, reason why Congress might have created the lesser penalty and still intended some play for section 1001, would be that Congress intended to distinguish between a simple failure to report and a currency reporting violation that is accompanied by affirmative misrepresentations, allowing punishment of the latter much more harshly than a "mere" failure to report.[11] This hypothesis finds no support in the legisla-

---

11. This hypothesis is contrary to an alternative interpretation that *all* violations of 31 U.S.C. § 1101 (and § 1058) also violate 18 U.S.C. § 1001. *See United States v. Masters,* 612 F.2d 1117, 1122 (9th Cir.1979), which repeatedly states that a defendant's section 1001 conviction was for "concealing a material fact." This language suggests that no affirmative misrepresentation of any kind is needed to violate section 1001, provided that "concealment" has occurred. Thus, under the majority's view, *any* willful failure to make the reports required by 31 U.S.C. § 1101 could form the basis for a section 1001 prosecution. *See also United States v. UCO Oil Co.,* 546 F.2d 833, 836 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (characterizing coverage of section 1001 as follows: "The law of fraud knows no difference between express misrepresentation on the one hand and implied misrepresentation or concealment on the other.")

tive history, however, and is conclusively refuted by the existence of 31 U.S.C. § 1059 (1976), entitled "Additional criminal penalty in certain cases." This section imposes penalties of up to five years in prison and a maximum fine of $500,000 upon persons who violate 31 U.S.C. § 1101 in furtherance of the commission of some other violation of federal law or as part of "a pattern of illegal activity." Section 1059 does not cross-reference section 1001; neither does it single out for "additional penalties" currency violators who make affirmative misrepresentations. Based on this evidence, I conclude that Congress never intended the sanctions of 18 U.S.C. § 1001 to apply to persons who falsely state that they are carrying no unreported currency in excess of $5,000.[12] I would reverse the appellant's conviction on this basis[13] as well as on the basis of the illegality of the stop of Duncan.

The present statutory question is distinguishable from the one decided in *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941). That case held that the lesser penalty provided by Congress for reporting violations under the "Hot Oil Act," 49 Stat. 30 (1935), should not be taken to mean that the forerunner to 18 U.S.C. § 1001 could not *also* be applied to punish persons who filed false reports concerning contraband oil. 312 U.S. at 95, 61 S.Ct. at

523. But unlike the currency smuggling problem that is the subject of the present case, the problem of contraband oil was specifically addressed by Congress when it amended section 1001 to its present form in 1934. *Gilliland* itself acknowledges as much. The opinion describes the history of the statute as follows:

> Legislation had been sought by the Secretary of the Interior to aid the enforcement of laws relating to the functions of the Department of the Interior and, in particular, to the enforcement of regulations under § 9(c) of the National Industrial Recovery Act of 1933 with respect to the transportation of 'hot oil.' The Secretary's effort was due, as he stated, to the lack of a law under which prosecutions might be had 'for the presentation of false papers.'

312 U.S. at 93–94, 61 S.Ct. at 522–23.

In the present case, by contrast, Congress cannot be said to have intended section 1001 as a sanction for the currency reporting statutes. Also, it is important that the false statements at issue in *Gilliland* were contained in *written* documents filed with the Government, unlike the oral, unsworn statements involved in *Bedore* and the present case. The *Gilliland* decision was premised on the view that section 1001 is basically intended to apply only to "false

---

12. As a general rule, subsequent Congressional measures carry little weight in an inquiry concerning the intent underlying a prior enactment. The present statutory question, however, is unusual in this regard, because Congress could not in 1936 have had any "intent" to punish statements that were not *then* material to anything within the scope of a federal interest, i.e., currency reporting. If 18 U.S.C. § 1001 is to apply to the false statements involved in the present case, it is only because the subsequent 1970 passage of the currency reporting statute subjected them to such coverage. Therefore, the question whether Congress *in 1970* intended to extend the coverage of section 1001 to embrace false statements concerning transported currency is indeed a proper focus for our inquiry in this case.

13. The majority's conclusion is also erroneous for a separate reason, one that can be wholly derived from Ninth Circuit precedent. All three cases affirming section 1001 convictions of defendants who falsely stated that they were not carrying excess currency involved defend-

ants who were carrying currency *into* the country. These cases rely on this circumstance to uphold the conviction. *Bedore* was reconciled in these cases only by virtue of a theory that the false statements related to a "privilege" granted by the Government, that is, the "privilege of entry" into the United States. *See United States v. Carrier,* 654 F.2d 559, 561 (9th Cir.1981); *see also United States v. Rose,* 570 F.2d 1358, 1364 (9th Cir.1978).

The present case involved statements made by a defendant as he attempted to *leave,* not enter, the country. Since leaving the country is not even arguably a government-granted privilege, the distinction employed in *Carrier* and *Rose* plainly cannot be used here. Although I do not necessarily consider the "privilege of entry" theory to be consistent with *Bedore,* still I believe the majority is wrong to ignore the significance of later cases that have relied on the distinction to permit section 1001 convictions.

and fraudulent papers," including "affidavits, documents, etc." 312 U.S. at 95, 96, 61 S.Ct. at 523, 524. *Gilliland* therefore is not inconsistent with the view I take in the present case, based on *Bedore,* that the oral statements of the appellant relating to excess undeclared currency are not within the purview of 18 U.S.C. § 1001.[14]

The Supreme Court in *Williams v. United States,* —— U.S. ——, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) employed the same type of narrowing construction of a statute proscribing federal false statements that I would apply in the present case. The issue in *Williams* was whether 18 U.S.C. § 1014, that makes it a crime to "knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security," may be used to punish defendants who engaged in a fraudulent "check-kiting" scheme involving the passing of worthless checks. Even though, as Justice Marshall's dissent observed, such bad checks seem to fall within the common definition of a "false statement," *see* 102 S.Ct. at 3098–99, the Court ruled that the defendants had not made statements prosecutable under section 1014. In reaching this interpretation, it emphasized the fact that bad checks are plainly prohibited by other law.

Given this background—a statute that is not unambiguous in its terms and that if applied here would render a wide range of conduct violative of federal law, a legislative history that fails to evidence congressional awareness of the statute's claimed scope, and a subject matter that traditionally has been regulated by state law—we believe that a narrow interpretation of 1014 would be consistent with our usual approach to criminal statutes.

I believe a similar interpretive approach should be taken in the present case.

---

**14.** For cases from other circuits that reach a contrary result *see United States v. Anderez,* 661 F.2d 404 (5th Cir.1981) and *United States v. Fitzgibbon,* 576 F.2d 279 (10th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978).