**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert CHEMALY, Defendant-Appellant.**

**No. 83–5065.**

United States Court of Appeals, Eleventh Circuit.

Sept. 20, 1984.

Rehearing Granted Dec. 18, 1984.

---

Rosen & Rosen, P.A., Lawrence N. Rosen, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Patricia D. Kenny, Linda Collins Hertz, Gregory W.

Kehoe, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJO-FLAT and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

This case involves the warrantless search at the border of a person departing the United States. The search discovered over $5,000 in currency, and the defendant was charged with currency reporting violations and with making false statements to customs officials. The currency reporting statute, former 31 U.S.C. §§ 1101, 1105, requires that probable cause and a warrant exist before searches for violations can occur. We must decide whether the border exception to the fourth amendment's warrant requirement, applicable to incoming passengers, applies in this case to the defendant, an outgoing passenger, and relieves the customs service of the warrant requirement of the statute. We hold that the border exception does not relieve the customs service of the statute's warrant requirement, that the defendant did not consent to the search, and that the convictions must be reversed because of the illegal search.

## I. Background

DEA agent Marin received a phone call September 30, 1982 from a confidential informant (known to Marin as Number 24), who had previously provided reliable information. Number 24 stated that Chemaly would be taking Eastern Airlines flight 23 to Aruba that day and would be taking $500,000 in a cardboard box capable of holding TV sets or electrical equipment, to be used to purchase cocaine. After a second call from Number 24 to Marin, the DEA passed the information to special agents of the South Florida Task Force assigned to Miami International Airport.

Number 24 was unable to reach Marin for a third call, but the informant then spoke with Agent Turner. Number 24 described the prior conversations with Marin and then told Turner that Chemaly would carry the money in a brown box with yellow ribbon or tape. Turner passed this information to Agent Colon of the task force.

Colon, along with agents of the customs service, arrived at the airport shortly before flight 23 was to leave. The agents ascertained that Chemaly was a passenger on flight 23 to Aruba. The agents saw no one carrying a brown box with yellow tape or ribbon on it but spotted a person with a yellow shopping bag that contained a small brown box. At Colon's request a ticket agent paged Chemaly, who identified himself to the ticket agent. Chemaly was not the individual carrying the yellow bag but was standing near that person. Chemaly and that person were part of a group of five men standing together.

Task Force agents then placed English and Spanish language posters in the waiting area. These posters described currency reporting requirements (one must report the import or export of more than $5,000 in currency) and the civil and criminal penalties for violating the requirements. Announcements containing the same information were made over the public address system. Agent Colon noticed that Chemaly and those with him stopped talking and listened to the announcement.

After passengers entered the jetway, Agent Medellin of the customs service asked each passenger whether he or she was taking more than $5,000 out of the country. Medellin had customs form 4790 (used for reporting currency being taken out of the country) in his hand for distribution. Chemaly did not ask for a form. Medellin asked Chemaly if he was carrying more than $5,000, and Chemaly stated "no."

Further down the jetway Agent Riggs of the customs service and customs patrol officer Krockenburger stopped, questioned, and searched every person who had been standing with Chemaly in the waiting room. One by one each member of the group was questioned and his person and

belongings searched, including the man in possession of the yellow shopping bag with the brown box in it. The box contained neither currency nor contraband. Chemaly was the last of the group to be stopped and searched. Thus, the customs agent stopped and searched him after the yellow bag and the brown box had been searched and found to be innocent.

When Chemaly reached the agents, he was also questioned. Chemaly was told to step aside so that the other passengers could continue to board the plane, and he was removed from the flow of traffic. Riggs requested Chemaly's passport and ticket, and Chemaly handed them to the agent.

Riggs asked Chemaly how much cash he was taking out of the United States. Chemaly replied that he had about $4,000. Riggs asked him to produce the money, and Chemaly pulled out $4,900 in $100 bills from his pocket. Riggs, suspicious because of the amount and the bill denominations, asked if he could examine Chemaly's attache case. Chemaly agreed and opened the case. Riggs found an envelope inside the case that because of its shape and size looked as though it might contain Federal Reserve notes. Riggs asked Chemaly if he knew the contents of the envelope. Chemaly stated that it was for his father. Riggs then asked if the envelope could contain currency. Chemaly responded that it could. Riggs opened the envelope and found $10,000 in $100 bills wrapped in gift wrapping.

Riggs had noticed a bulge in Chemaly's pants. He asked Chemaly if he was carrying any additional currency; Chemaly said he was not. Chemaly then consented to a pat-down search that produced an additional $10,049 from his pocket and wallet. Thus the total of currency found in Chemaly's possession was $24,949.

Chemaly was then taken back to the passenger waiting area where Medellin advised him of his rights. Chemaly stated that he did not fill out form 4790 when leaving because he had brought the money to the United States and had not filled out

the form upon arrival. On three previous occasions he had filled out form 4790.

Chemaly was charged with making a false statement to a customs official in violation of 18 U.S.C. § 1001 (1976) (Count I) and with failing to file form 4790 in violation of former 31 U.S.C. § 1101 (1976) (recodified at 31 U.S.C.A. § 5316 (1983)) (Count II). Chemaly filed a motion to suppress, which the district court denied. The district court found that only reasonable suspicion was necessary to search at the border a person leaving the country. The court found reasonable suspicion. The court further found Chemaly's consent to the search was voluntary but expressly stated that its consent determination was only a secondary ground for denial of the suppression motion. After denying the motion to suppress, the district court found Chemaly guilty on both counts.

Chemaly contends that reasonable suspicion did not exist for his seizure and that probable cause and a warrant are required for search of outgoing passengers at the border for currency violations. The government counters that no suspicion is required for a search of outgoing passengers at the border or its functional equivalent and that the search and seizure of Chemaly were thereby justified. Alternatively the government contends that, if the border search rationale did not justify the search, Chemaly consented to the stop and search and cannot complain of the results and that probable cause existed for his arrest and search.

II. The border exception and § 1105

Former 31 U.S.C. § 1101 criminalized the exportation of over $5,000 in currency without filing the required report. Former 31 U.S.C. § 1105 (recodified at 31 U.S.C.A. § 5317 (1983)) provided for searches of persons suspected of violating this statute. Section 1105 provided:

(a) If the Secretary has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed or contains material omissions or

misstatements, he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of any or all of the following:

(1) One or more designated persons

. . .

(3) One or more designated or described letters, parcels, packages, or other physical objects . . . .

Any application for a search warrant pursuant to this section shall be accompanied by allegations of fact supporting the application.

(b) This section is not in derogation of the authority of the Secretary under any other law.

The legislative history of this statute indicates that the warrant requirement of § 1105 is mandatory absent existing authority to conduct a search of outgoing passengers. On the warrant requirement the Senate Report states:

The Secretary is given authority to conduct searches to enforce compliance provided he first obtains a search warrant from any court of competent jurisdiction upon a showing of probable cause. The purpose of the warrant is to avoid an excessive burden on persons entering or leaving the country. However, nothing in the bill would limit the authority of the Secretary to conduct searches under existing law. Should unreported currency be discovered pursuant to a search by the Bureau of Customs under its existing legal authority, the person transporting the currency would be subject to the penalties under this legislation if the discovery of the unreported currency was incidental to the main purpose of the search.

S.Rep. No. 1139, 91st Cong., 2d Sess. 7 (1970).

Supplemental statements of other senators confirm this view:

The bill considered by the committee contained a provision, the enforcement of which would have required the opening of mail and searches of individuals leaving the United States. The committee wisely amended this provision to require that a search warrant be secured before any search could take place, thus protecting tourists and other travelers from unnecessary invasion of personal privacy.

*Id.* at 19 (supplemental views of Sens. Bennett, Tower, Goodell, and Packwood); *id.* at 15 ("The Secretary is authorized to conduct searches and mail checks provided that he first obtains a warrant."); 116 Cong.Rec. 32,637 (1970) (statement of Sen. Bennett) ("In the committee, we considered the invasion of privacy that would occur if this provision were to be enforced and amended the bill to require that a search warrant be secured before any search of persons or mail could take place.").

■ The legislative history thus indicates that the senators who added the warrant requirement believed that persons leaving the country should not be subjected to random, warrantless searches. Congress intended to require search warrants for searches for currency violations by outgoing travelers.

■ The government argues that we should ignore the clear import of § 1105 and its history and hold that the universal exception to the fourth amendment's search warrant requirement applicable at the border relieves the government of the necessity of obtaining a warrant under § 1105. Because of the strong policy of national self-protection, the fourth amendment is relaxed at the border, at least with respect to incoming persons and objects.

[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border . . . .

. . . . .

Border searches . . . have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside.

*U.S. v. Ramsey*, 431 U.S. 606, 616, 619, 97 S.Ct. 1972, 1978, 1980, 52 L.Ed.2d 617 (1977); *see also Carroll v. U.S.*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925).

We recognize that other circuits have applied the universal border exception to the fourth amendment's search warrant requirement applicable to a search of incoming passengers to outgoing passengers as well. *See U.S. v. Udofot*, 711 F.2d 831, 839–40 (8th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *U.S. v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982), *cert. denied*, — U.S. ——, 103 S.Ct. 2436, 75 L.Ed.2d 1321 (1983); *U.S. v. Swarovski*, 592 F.2d 131, 133 (2d Cir.1979). In *U.S. v. Rojas*, 671 F.2d 159, 164 (5th Cir.1982) (Unit B), we declined to decide whether fourth amendment protections were relaxed at the border for outgoing as well as incoming passengers.

In *Rojas*, as in this case, the defendant argued that § 1105 required a warrant for searches for currency reporting violations and that the search without a warrant in his case was illegal. The court responded to the defendant's argument that this section required a warrant by finding that consent, a longstanding exception to the warrant requirement, constituted other authority, in the language of § 1105 and the Senate Report, to conduct the search and relieved the government of the warrant requirement. 671 F.2d at 166.

The government urges that, in the present case, the fact that the search is at the border, like the consent in *Rojas*, constitutes such an exception to § 1105's warrant requirement and "other authority" necessary to uphold a warrantless search by the customs service. We write on a clean slate. No other court has squarely considered whether the border exception

should be applied to relieve the government of the warrant requirement imposed by § 1105 or its successor, 31 U.S.C.A. § 5317 (1983). In *Rojas* the court found that consent relieved the government of this requirement. In *U.S. v. Duncan, supra*, the majority did not discuss § 1105's warrant requirement. Judge Fletcher, dissenting, did, however, consider the issue. In *Duncan*, the defendant was convicted of violating 18 U.S.C. § 1001, which prohibits false statements to government officials, by misrepresenting to customs officials the amount of currency on his person. The search of his person produced currency in excess of the admitted amount and proved the falsity of his statement under 18 U.S.C. § 1001. Judge Fletcher pointed out that the search, which was necessary to convict under § 1001, was not effected pursuant to a warrant required by § 1105. 693 F.2d 982–83.

To construe the statute as suggested by the government would render it meaningless. Individuals traveling out of the country violate the currency reporting requirements at the border, if at all. Congress manifested its intent to preserve the privacy of tourists and travelers departing this country by requiring a warrant to search for currency reporting violations. To hold that the general border search exception allows such searches for currency violations without probable cause and a warrant would remove that privacy protection at the place where Congress intended for it to attach.[1]

■ As noted above this circuit has not decided whether the fourth amendment allows random searches of outgoing passengers at the border. But what the Constitution does or does not *require* is not the issue in this case. The Constitution provides the outer limit of the government's

---

1. Other than the border exception and consent, discussed below, the government suggests no "authority," under the statute and Senate Report, pursuant to which this search was conducted and to which the discovery was incidental. For example, § 1105 criminalizes failure to report importation and exportation of currency. A search of incoming passengers pursuant to 19

U.S.C. § 482 (1976) (general authority to search incoming passengers) that also turned up currency in excess of $5,000 would be the type of discovery allowed by the statute and Senate Report because the discovery would be incidental to the main purpose of the search and conducted pursuant to existing authority.

ability to act upon the individual. Congress, as the enunciator of national policy and regulator of government officials, can more severely restrict the customs service in its encounters with citizens than would be required by the Constitution. By enacting the warrant requirement, Congress determined that the privacy interests of tourists and travelers needed this added protection. We may not undercut that policy choice and change the directive given to the customs service. The border exception does not relieve the government of the warrant requirement of § 1105.

### III. Consent

The government argues, and the district court found, that Chemaly voluntarily consented to the search of his person and belongings. Under *Rojas* a search pursuant to such a consent constitutes authority of the customs service under other law and relieves the service of the necessity of obtaining a warrant under § 1105. 671 F.2d at 166.

 "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *see also U.S. v. Alegria*, 721 F.2d 758, 761 (11th Cir.1983). Relevant factors in determining voluntariness, none of which is dispositive, include

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*U.S. v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir.1981) (Unit B) (footnotes omitted), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The government bears the burden of proving the voluntariness of the consent. *Schneckloth*, 412 U.S.

at 222, 93 S.Ct. at 2045. We review the district court's determination that Chemaly's consent was voluntary under the clearly erroneous standard. *See Alegria*, 721 F.2d at 761; *U.S. v. Robinson*, 690 F.2d 869, 875 (11th Cir.1982).

 Because one of the factors used in a voluntariness determination, the presence of express or implied coercion, is similar to factors involved in determining whether a seizure has occurred under the fourth amendment, *see Robinson*, 690 F.2d at 876–77 n. 5, factors involved in a seizure question are also relevant in determining the voluntariness of consent. Retention of an airline ticket by law enforcement officers while questioning an individual is a significant factor in finding that a *Terry*-type stop has occurred. *U.S. v. Puglisi*, 723 F.2d 779, 784 (11th Cir.1984); *U.S. v. Thompson*, 712 F.2d 1356, 1360–61 (11th Cir.1983); *U.S. v. Waksal*, 709 F.2d 653, 660–61 (11th Cir.1983); *U.S. v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982). As the Supreme Court recently stated:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

*Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983) (plurality opinion). Riggs asked for and retained Chemaly's ticket and passport. Although this court has previously stated that no one factor is dispositive in a voluntariness determination, *see Phillips*, 664 F.2d at 1023, retention of documents such as a driver's license and an airline ticket has been treated as highly significant on the question of whether a seizure has occurred. *Thompson*, 712 F.2d at 1360–61.

██ Another factor indicating that consent was not voluntarily given is the failure

of Riggs to inform Chemaly of his right to leave and not to consent to the search. While the government is not required to prove that Chemaly knew he had the right to refuse to consent, such knowledge or lack thereof is a factor to consider in determining voluntariness. *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059; *Waksal*, 709 F.2d at 661. An additional factor is Rigg's treatment of Chemaly in a different manner than the agent's treatment of the other passengers. Riggs told Chemaly to step aside to let the other passengers pass. This different treatment, along with Rigg's specific and repetitive questions about the amount of currency Chemaly was carrying, "intimate that an investigation ha[d] focused on a specific individual [and] easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention." *U.S. v. Berry*, 670 F.2d 583, 597 (5th Cir.1982) (en banc) (Unit B) (footnote omitted); *see also Robinson*, 690 F.2d at 876; *Elsoffer*, 671 F.2d at 1298.

 Because the agent retained Chemaly's ticket and passport, removed him from the other passengers for questioning, and did not inform him of his right to refuse consent, we hold that the consent to search was not voluntary and that the district court's contrary finding is clearly erroneous.

IV. Probable cause for arrest without a warrant and search incident to such arrest

 Judge Tjoflat would hold, and the government argues, that the search of Chemaly without a warrant was justified as a search incident to an arrest that was supported by probable cause. The trial court did not find probable cause but only reasonable suspicion, which was all it believed necessary to justify a search at the border. The existence or not of probable cause, which the district court did not address, is for that court in the first instance. But, pretermitting this, we look briefly at the contention.

What we have is (1) a previously reliable informant, who (2) identifies a person named Chemaly, (3) identifies the date, flight number, and destination of that person's trip, and (4) states that Chemaly will have with him $500,000 in a brown cardboard box with yellow tape or ribbon on it.

The only ensuing events tending to corroborate the tips are that Chemaly appeared at the airport on the date stated and for the flight and destination stated. A fact tending to show that the tip was not reliable was that he did not have a box in his possession. Possibly an argument can be made that possession of a cardboard box by someone else standing in a group with Chemaly (though the box did not meet the tipster's description) tended to reinforce the tip. The fact is at least as indicative of lack of reliability as of reliability. But even if one accepts that possession by someone else of a box containing currency could reinforce the tip as to Chemaly, the box was searched and found not to contain currency before Chemaly was stopped and searched. If (arguably) the box might have supplied criminal details corroborating the tip, in fact it did just the reverse. Chemaly's presence and his flight plans were innocent details, important only to the extent they might make criminal details reliable. *See Illinois v. Gates*, 462 U.S. 213, ——, ——, 103 S.Ct. 2317, 2334, 2335, 76 L.Ed.2d 527, 551, 552 (1983) (verified innocent details rendered it more likely that details of guilt were true as well). Once the box was searched, there were no criminal details. Nothing supported the informant's conclusory statement of criminality and, indeed, the inaccuracy of his statements concerning the box tended affirmatively to show lack of reliability.

The government was not relieved from the probable cause and warrant requirement of § 1105 by either the border exception, Chemaly's involuntary consent, or by a search incident to an arrest supported by probable cause. All evidence obtained from the illegal search must therefore be

excluded.[2] The conviction for violation of § 1101 must be reversed. Because the illegally seized currency and statements made by Chemaly, which were the fruit of the illegal search, were necessary to prove the falsity of the statement under 18 U.S.C. § 1001, that conviction must be reversed as well.

REVERSED.

2. The dissent questions the appropriateness of exclusion as the remedy for the failure of federal officials to obtain the search warrant required by statute. This issue is raised only by the dissent. It was not raised by the government. In *Rea v. U.S.*, 350 U.S. 214, 217–18, 76 S.Ct. 292, 294–95, 100 L.Ed. 233 (1956), the Court considered the appropriate remedy when a federal agent obtained evidence in violation of Fed.R.Crim.P. 41(c), the equivalent of a federal statute governing issuance of search warrants. The Court excluded the evidence and all testimony gained from it in both federal and state court. The Court noted that a constitutional question was not presented but rather the appropriateness of the remedy to be utilized when evidence is seized in violation of statute by federal officials.

A federal agent has violated the federal Rules governing searches and seizures—Rules prescribed by this Court and made effective after submission to the Congress. See 327 U.S. 821 *et seq.* The power of the federal courts extends to policing those requirements and making certain that they are observed. As stated in *Wise v. Henkel*, 220 U.S. 556, 558 [31 S.Ct. 599, 600, 55 L.Ed. 581], which involved an order directing the district attorney to return certain books and papers unlawfully seized:

"... it was within the power of the court to take jurisdiction of the subject of the return and pass upon it as the result of its inherent authority to consider and decide questions arising before it concerning an alleged unreasonable exertion of authority in connection with the execution of the process of the court."

No injunction is sought against a state official. The only remedy asked is against a federal agent who, we are told, plans to use his illegal search and seizure as the basis of testimony in the state court. To enjoin the federal agent from testifying is merely to enforce the federal Rules against those owing obedience to them.

The command of the federal Rules is in no way affected by anything that happens in a state court. They are designed as standards for federal agents. The fact that their violation may be condoned by state practice has no relevancy to our problem. Federal courts sit

TJOFLAT, Circuit Judge, dissenting:

The majority in this case construes the warrant requirement of 31 U.S.C. § 1105 (recodified at 31 U.S.C. § 5317 (1982)) so narrowly, and provides a remedy so harsh, that the enforcement of the currency reporting requirements of 31 U.S.C. § 1101 (recodified at 31 U.S.C. § 5316 (1982))[1] and the regulations promulgated thereunder

to enforce federal law; and federal law extends to the process issuing from those courts. The obligation of the federal agent is to obey the Rules. They are drawn for innocent and guilty alike. They prescribe standards for law enforcement. They are designed to protect the privacy of the citizen, unless the strict standards set for searches and seizures are satisfied. That policy is defeated if the federal agent can flout them and use the fruits of his unlawful act either in federal or state proceedings.

In the only case cited by the dissent in which exclusion was not the remedy applied, *U.S. v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979), the Court specifically said that the particular procedures violated were "not required by the Constitution or by statute." The Court thus concluded that exclusion was not required when only agency regulations were violated. In the present case, as in *Rea*, the customs service violated a federal directive given by statute to obtain a search warrant.

Also, although Congress did not provide a remedy of exclusion in the statutory scheme for failure to obtain a search warrant, we believe Congress must have intended this remedy. When § 1105 was adopted the universal understanding of the remedy for an illegal search without a warrant was exclusion of the evidence. If Congress did not specify exclusion as the remedy in 1970 when the legislation was passed, it necessarily was because the remedy was obvious. It had been established in the constitutional area. *See Weeks v. U.S.*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (first application of exclusionary rule to evidence seized in violation of the fourth amendment); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (application of exclusionary rule to states). In the statutory area, *Rea* had been decided 14 years earlier. It can hardly be inferred that Congress meant there to be some remedy other than the remedy then accepted by the courts as the usual one. Moreover, 14 years later in 1984, exclusion as the remedy for an illegal search without a warrant remains the rule.

1. Section 1101 provides in relevant part

§ 1101. Reports

will be severely curtailed. Because I disagree both with the majority's conclusion that section 1105 was violated in this case and with its implicit assumption that such violation mandated the application of the exclusionary rule to suppress the evidence seized, I respectfully dissent. I first turn to the constitutional authorization for this search, and second to the statutory authorization therefor. Third, I will analyze whether Congress intended that an exclusionary rule be applied as a remedy for violations of the statute, and fourth, if not, whether we should use our supervisory power to do so. Finally, I will discuss whether the "inevitable discovery" rule, *see Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), precludes the application of an exclusionary rule, regardless of its source, in this case.

## I

I first note that the statutory warrant requirement is not required by the Constitution. It would clearly be constitutional under the fourth amendment for Congress to authorize a search of a passenger boarding an international flight, and his carry-on baggage, under the "exigent circumstances" search warrant exception once the searching officer had probable cause. *See*

(a) Persons required to file
Except as provided in subsection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—
(1) transports or causes to be transported monetary instruments—
·(A) from any place within the United States to or through any place outside the United States, or
(B) to any place within the United States from or through place outside the United States, or
(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States
in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.
(b) Contents of filed report
Reports required under this section shall be filed at such times and places, and may contain such of the following information and any additional information, in such form and in such detail, as the Secretary may require:

*United States v. Juarez,* 573 F.2d 267 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *see generally* 2 W. LaFave, *Search and Seizure* §§ 5.4(b), 5.5(c) (1978). Second, although this circuit has not addressed the issue, many courts are of the view that searches at the international border, or its functional equivalent, of outgoing passengers, like such searches of incoming passengers, are within the executive's plenary authority to make "without any modicum of suspicion of criminal activity." *United States v. Rojas,* 671 F.2d 159, 164 (11th Cir.1982). *See also United States v. Udofot,* 711 F.2d 831, 839–40 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Duncan,* 693 F.2d 971, 977 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979). Accordingly, the Constitution did not prohibit the search in this case.

## II

I next turn to whether the search violated the statute. Section 1105 provides a warrant requirement, which, as the majority correctly states, the legislative history

(1) The legal capacity in which the person filing the report is acting with respect to the monetary instruments transported.
(2) The origin, destination, and route of the transportation.
(3) Where the monetary instruments are not legally and beneficially owned by the person transporting the same, or are transported for any purpose other than the use in his own behalf of the person transporting the same, the identities of the person from whom the monetary instruments are received, or to whom they are to be delivered, or both.
(4) The amounts and types of monetary instruments transported.
The penalty for the violation of § 1101 is found at 31 U.S.C. § 1058 (recodified at 31 U.S.C. 5322 (1982)), which provides
§ 1058. Criminal penalty
Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned not more than one year, or both.
These provisions were recodified substantially unchanged.

shows to be the generally intended means of enforcing the currency reporting provisions of section 1101. (The discovery of the money by *any other* lawful search is proper only if such discovery is "incidental to the main purpose of the search", S.Rep. 1139, 91 Cong.2d Sess. 7 (1970), and authorized by *other* authority of the Secretary.) In order to obtain a warrant under section 1105, the customs officials must be able to show probable cause that objects sought in connection with a crime will be found. *See United States v. Green,* 634 F.2d 222, 225 (5th Cir.1981) (discussing probable cause requirement for issuing a search warrant). Since it is not a crime to carry money out of the United States, but rather only a crime to fail to fill out the necessary form when carrying out the money, the crime is not clearly threatened until the potential offender is at a point where he no longer has access to the relevant forms and has presumably committed himself to travelling across the border. Almost without exception, such a status could not arise until the traveller was in the waiting area, preparing to board the plane. Accordingly, the agents could only have probable cause to search after they had observed the offender's conduct at the airport. See *United States v. Rojas,* 671 F.2d 159, 165–6 (11th Cir.1982) (agents did not have probable cause to search until observations of defendant on the jetway about to enter the plane).[2]

Under the majority's interpretation of section 1105, customs agents will only be able to search a traveller or his possessions if the traveller consents, *id.,* or if the plane is sufficiently delayed that a warrant can be obtained between the time the passenger starts to board and the time the plane departs. In contrast, I would interpret the statute to allow what we have in this case, a search of the passenger's person, incident to a lawful arrest for violation of currency laws and *for making a false statement in* violation of 18 U.S.C. § 1001 (1983), which, though it yielded currency, is proper on the

theory that the main purpose of a search incident to arrest is to find weapons and prevent destruction of evidence. *See generally* 2 W. LaFave, Search and Seizure § 5.2 (1982). Allowing this kind of search would promote the statutory objectives, giving the officers a reasonable ability to enforce the currency laws without inconveniencing any passengers whom the police did not have probable cause to arrest. Agents could arrest the passenger without a warrant on probable cause that he was violating currency laws, and they could search him consistent with the "search incident to arrest" exception. They could also seize his baggage and hold it pending the issuance of a warrant to search the baggage.

Such a search would not violate the statutory language; section 1105(b) states that its warrant requirement is "not in derogation of the authority of the Secretary under any other law." Nor would such a search fall afoul of the congressional intent exhibited in the legislative history. The history provides:

> However, nothing in the bill would limit the authority of the Secretary to conduct searches under existing law. Should unreported currency be discovered pursuant to a search by the Bureau of Customs under its existing legal authority, the person transporting the currency would be subject to the penalties under this legislation if the discovery of the unreported currency was incidental to the main purpose of the search.

S.Rep. No. 1139, 91st Cong. 2d Sess. 7 (1970).

The authority to search incident to arrest has long been recognized. *See* LaFave, *supra,* at § 5.2. The main purpose of a search incident to arrest is not to go on a fishing expedition for evidence; probable cause to arrest must already exist. Rather, the arresting officers search the arrestee for weapons and for any evidence on

---

**2.** 31 C.F.R. § 103.25(b) (1983) provides that reports "shall be filed ... *at the time of departure*"

(emphasis added).

his person of the crime for which he is arrested because of the probability that he might destroy it.

In this case, the Customs officers, before they searched Chemaly, had probable cause to arrest him on the currency charge and for making a false statement. Customs had received three calls from an informant, who previously had provided reliable information,[3] indicating that Chemaly would be taking a particular flight, the September 30, 1982 Eastern Airlines flight 23, to Aruba, with a substantial amount of cash in a cardboard box with yellow tape for the purpose of buying cocaine. The agents determined that Chemaly was booked on the flight and saw him with a man carrying a yellow and brown bag with a brown box inside. The agents, having found that Chemaly had not filed the requisite treasury form, actively made him aware of the currency reporting requirements. He did not undertake to fill one out. He stated to the agents as he proceeded to the jetway that he was carrying under $5,000. At that point, based on the high degree of accuracy of the tip and Chemaly's failure to file the form by the time he got to the jetway, the agents had probable cause to arrest him on both charges. *See Rojas, supra* (noting that probable cause to arrest existed on similar facts).

In *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980), the Supreme Court held that once the police clearly had probable cause to arrest the petitioner, "[w]here the formal arrest followed quickly on the heels of the challenged search of the petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." Here, Chemaly was arrested shortly after the search in question. Probable cause to arrest existed prior to the search. I would accordingly find no statutory violation.

### III

In my view, before considering whether to apply our supervisory power to impose a remedy for a statutory violation, we should look to what remedy Congress intended to create when it enacted the statute. Since section 1105 contains no express remedy, in determining whether we should imply the remedy of suppression of evidence from section 1105 itself we should look to the standards of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[4] The Supreme Court in *Cort* addressed whether to imply from a statute a certain remedy accruing to a certain party. This is the identical question we face here, whether Congress intended to create a remedy of suppression accruing to the benefit of the violator of the currency reporting regulations.

The test the Supreme Court used in *Cort* asked:

First, is the plaintiff "one of the class for whose *especial* benefit the statute

3. That an informant has in the past given reliable information increases the trustworthiness of the current information not only because of the inference from past conduct but also because the more the informant is known to the police the more likely that the statutory sanction for making a false statement to the police, see 18 U.S.C. § 1001, could be imposed.

4. While in *United States v. Giordano,* 416 U.S. 505, 524–530, 94 S.Ct. 1820, 1831–33, 40 L.Ed.2d 341 (1974), the Supreme Court did not apply *Cort* to determine whether Congress intended suppression as a remedy for a statutory violation, there the court was engaged in statutory construction of an express suppression remedy in the wiretapping provisions, 18 U.S.C. § 2516, *et seq. Giordano* thus supports the proposition I put forth in this section; i.e., that whether Congress intends a remedy, and the scope of the

remedy Congress intends to authorize, should be the preliminary questions. The only question the *Giordano* court addressed was whether Congress intended the suppression of evidence for violation of the wiretapping provisions even though no constitutional violation had occurred. The Court indulged in no presumptions one way or the other, but merely parsed the statutory language and the legislative history with an eye to giving effect to all sections of the wiretap law. *Id.* at 526–528, 94 S.Ct. at 1832. The Court also quoted that portion of the legislative history showing that Congress intended to incorporate the holding of *Nardone v. United States,* 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) (suppressing evidence seized in violation of the wiretap law, though not discussing source of Court's power to do so.) *Id.* at 529, 94 S.Ct. at 1833.

was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted.) The answer to the first and fourth questions is clearly in the affirmative. Regarding the first, the warrant requirement was enacted to protect international travellers from undue harassment by border officials. Regarding the fourth, international border activity is certainly an appropriate subject for a federal remedy.

The second inquiry, however, yields no dispositive information regarding whether we should imply a suppression remedy. Neither the statute in this case nor the legislative history gives any hint of what remedy, if any, Congress intended to provide for violations of the search warrant provision. *Giordano, supra* note 4, and the wiretap statute, illustrate that Congress both knew how to write a statute requiring the suppression of evidence as a remedy for a purely statutory violation and would do so, even when prior case law indicated the courts would suppress such evidence without a directive. Moreover, it cannot be said that, when section 1105 was enacted, the state of the case law was so plain that Congress, by remaining silent, intended that the courts continue to apply the exclusionary rule. Only one case, *United States v. Soto-Soto,* 598 F.2d 545 (9th Cir.1979), holds that evidence should be suppressed as a remedy for a pure border search conducted in violation of a statute, or for searches made without sufficient exigent circumstances or probable cause. I have

found only four Supreme Court cases that prescribed suppression of evidence as a remedy for a statutory violation.[5] All of these cases are limited in scope; their holdings do not constitute broad statements of law to be applied on other facts.

Neither the Congressional silence as to the remedy that should flow from a violation of section 1105 nor the legislative history, then, is particularly helpful. Arguably, we have a slight inference that Congress did not intend suppression as a remedy and certainly no inference that Congress did intend it.

The third *Cort* inquiry is the most difficult here. *Cort* asks whether the remedy sought is consistent with the underlying purposes of the federal scheme. Under the view the majority takes of the statute, I would be forced to answer that it is not. As I have pointed out, *see supra* section II, the majority's interpretation of the statute would allow the currency reporting requirements at issue to be enforced only if the subject consented to a search, or if the plane was substantially delayed between the time the passengers began to board and the time the plane left, thus allowing a warrant to be obtained. I cannot conclude that Congress created the reporting requirements with the intention that they not be enforced. The requirements are already perilously close to being unenforceable. Application of the suppression remedy would place a further damper on the statute's enforceability.

I would note at this point that suppression is not the only alternative; an implied cause of action for money damages in favor of the offender is a possibility. In fact, it is possible that Congress intended no remedy, but rather simply intended the warrant requirement as a direction to the Secretary. In evaluating which alternative is most consistent with the statutory scheme, I believe that we must consider the gravity of the problem that these currency

---

**5.** *See Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *Rea v. United States,* 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956); *Nardone, supra.*

reporting requirements collaterally address, that is, large scale movement of drugs and contraband into the country by persons exiting the country temporarily with large amounts of currency. The spirit of the warrant requirement is to avoid harassment of innocent travellers, regarding whom no probable cause to search or arrest exists. Because of the seriousness of the drug problem, I believe that Congress must have intended as remedy the least onerous means that would deter Customs officers from disobeying the warrant requirement. Either of the other two alternatives I have mentioned, an implied cause of action for damages or simply Secretary-enforced disciplinary requirements, would deter Customs officers from wrongful conduct and yet would vindicate the public interest in punishing violators of the currency laws. In contrast, suppression over-expands the spirit of the warrant requirement by extending protection from harassment to guilty travellers, and goes against the public interest by allowing violators of currency laws, in spite of all the ramifications their conduct has on the drug market, to go unpunished. For all the reasons I have stated above, it would be inconsistent with the statutory purposes to imply suppression as a remedy.

### IV.

I now turn to whether we should use our supervisory power to fashion a remedy of suppression. The Supreme Court in *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983), described the supervisory power as follows:

"[G]uided by considerations of justice," *McNabb v. United States,* 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations valid-

ly before the jury, and finally, as a remedy designed to deter illegal conduct.

(Citation omitted.) The supervisory power doctrine is an extraordinary one which should be "sparingly exercised." *Lopez v. United States,* 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963); *see United States v. Jones,* 433 F.2d 1176 (D.C. Cir.1970), *cert. denied,* 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971) (reversing district court's exercise of supervisory power to suppress evidence when no constitutional violation; apparently no statute governed conduct).

In *Rea v. United States,* 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956), the Supreme Court addressed a government agent's violation of Fed.R.Crim.P. 41(c) by seizing property under an insufficient warrant based on unsworn statements, in an otherwise constitutional seizure. The question before the Court was whether the agent could present the evidence in a state prosecution he had initiated. The Court noted: "We put all the constitutional questions to one side ... [W]e have then a case that raises not a constitutional question but one concerning our supervisory powers over federal law enforcement agencies." *Id.* at 216–217, 76 S.Ct. at 294. The Court then determined that suppression was required because the Federal Rules "are designed to protect the privacy of the citizen, unless the strict standards set for searches and seizures are satisfied. That policy is defeated if the federal agent can flout them and use the fruits of his unlawful act either in federal or state proceedings." *Id.* at 218, 76 S.Ct. at 294. The Court did not discuss any countervailing interests that might have existed.

In contrast, in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), the Court declined to apply the exclusionary rule, through its supervisory power, to suppress evidence seized in violation of Internal Revenue Service regulations. The Court noted the deterrent effect on the Internal Revenue Service's establishment of clear and definite regulations that application of the exclusionary

rule might have and determined that such an effect would not be in the public interest.

I would find the interests in this case more similar to *Caceres* than to *Rea.* The practical effect of a rigidly enforced exclusionary rule in this case will severely limit the power of the federal government to enforce section 1101's currency reporting requirements. As I have described, the agents are forced to rely on a delayed plane, so they can obtain a warrant, or on a valid consent to search luggage. Since the likelihood of either of the above occurring is extremely small, the agents, if they know that any misjudgment on their part will result in the exclusion of evidence, will be strongly discouraged from attempting to enforce the law. This problem would be somewhat alleviated were the search incident to arrest exception approved, *see supra* section II; however, as the statute stands it is not, in my opinion, an appropriate exercise of our supervisory power to hamper so severely its enforcement.

### V.

Even if the court should extend its supervisory power to provide a remedy of suppression, I would not apply the remedy in this case because, as the agents had probable cause to arrest Chemaly, they would certainly have arrested him on the jetway, brought him and his belongings back to the station, and, upon obtaining any necessary warrant, found the money. As the Supreme Court noted in *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), "The goals that are implicated by supervisory powers are not, however, significant in the context of [a case where] the errors alleged are harmless...." *Id.* at 1979.

In *Nix v. Williams,* — U.S. —, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Court articulated the "inevitable discovery" exception to the exclusionary rule. While that case involved the sixth amendment, the Court cited fourth amendment cases and discussed the policy reasons for the exception in a manner applicable to any unlawfully obtained evidence. The Court explained:

> The core rationale consistently advanced by this Court for extending the Exclusionary Rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.... On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.
>
> ... The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; ... but that is not the whole story. The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse* position than they would have been in if no police error or misconduct has occurred.... [E]xclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the Exclusionary Rule.

*Id.* at ___, 104 S.Ct. at 2508–09.

This theory applies in full in the case at hand. It is inconceivable to me that, having probable cause to arrest Chemaly, the agents would have let him get on the plane even had they not searched him. Were the arrest purely a result of the search, obviously the inevitable discovery doctrine would not apply; the defendant would never have been arrested had he not been

searched, and nothing would have been discovered. It is clear to me from the record, however, that once the agents had made their final pass at getting Chemaly to fill out the forms, they had sufficient probable cause to arrest and indeed would have done so absent the search. As in *Rawlings, supra,* the search and the arrest were part and parcel of the same encounter. Accordingly, I would find the money to have been inevitably discovered and the admission of the evidence to have been proper.