UNITED STATES of America, Plaintiff,

v.

Maria Teresa ZAPATA, Defendant.

UNITED STATES of America, Plaintiff,

v.

Maria Ofelia ZAPATA, Defendant.

Nos. 86–190–CR–SCOTT,
86–188–CR–SCOTT.

United States District Court,
S.D. Florida,
Miami Division.

May 23, 1986.

Remberto Diaz, Miami, Fla., for plaintiff.

Jose Baptesta, Miami, Fla., for defendant.

## MEMORANDUM DECISION

SCOTT, District Judge.

This Court, sitting as trier of fact, enters these findings of fact and conclusions of law:[1]

## FINDINGS OF FACT

1. On February 23, 1986, a team of United States Customs Officers experienced in interdiction went to the departure site of Avianca flight #7 at Miami International Airport. This flight was known by Customs to have a history of departing passengers who failed to report large amounts of currency when leaving the United States. Armed with this knowledge, Customs Officers Jacobo, Nimmoor, Ramirez and Estrada positioned themselves on or near the jetway in order to speak with selected passengers. This process is known as an "Outboard Enforcement Examination".

2. Senior Agent George Nimmoor and Agent Joe Ramirez observed five female passengers proceeding down the jetway. Nimmoor and Ramirez decided to question these passengers. Two of these passengers were the Defendants, Maria Ofelia Zapata and Maria Teresa Zapata.

3. In choosing to speak with these individuals, the officers relied upon various factors including age, clothing, demeanor, nationality, nature of luggage and type of jewelry worn.[2] Additionally, Agent Nimmoor was acting under information provided by a reliable confidential informant, that groups of five women acting in combination would be attempting to smuggle currency out of the country.[3]

4. Initially, as Nimmoor approached Maria Teresa Zapata and Maria Ofelia Zapata, he ascertained that neither Defendant spoke English. Nimmoor didn't speak Spanish. He therefore asked an Avianca employee, Clara Escobar, to act as an interpreter. She agreed. Conversations followed through the interpreter. Nimmoor asked if the Defendants understood the currency reporting requirement. Maria Teresa Zapata said "yes"; Maria Ofelia Zapata said "no". Nimmoor asked if he could have permission to inspect their carry-on luggage. Both Defendants consented. During his conversations with the Defendants, Nimmoor noted inconsistencies in answers, hesitancy and doubts in responses and inappropriate behavior for the situation. As a result, Nimmoor's suspicions were excited.[4]

---

**1.** These cases were consolidated for the purpose of this motion and the evidentiary hearing.

**2.** While none of these factors, standing alone, would constitute any reasonable suspicion, in tandem, they were a legitimate profile for currency violaters. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); and *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1984). *See, United States v. Elmore,* 595 F.2d 1036, 1039 n. 3 (5th Cir.1979), cert denied, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). "The Profile has proven to be a highly successful investigative

tool for police, as evidenced by the extraordinary large number of cases challenging convictions resulting from its use." *United States v. Waksal,* 709 F.2d 653, 656 n. 2 (11th Cir.1983).

**3.** While admittedly these Defendants did not turn out to be members of that group, nonetheless, it was a reasonable factor to rely upon in deciding to approach the women.

**4.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and *see, Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

5. In fairness, a review of the various factors bearing on consent is in order.[5] From the Government's viewpoint, Nimmoor's manner was not offensive; Defendants remained in the jetway (they were not removed to a separate facility); no items were taken or seized such as tickets, passports, or the like; no uniforms were worn but badges were shown; and no firearms were displayed. From the Defendants' viewpoint, Agent Nimmoor did not advise the Defendants of their right to refuse consent or furnish consent forms which were available.[6]

6. After obtaining consent from Maria Ofelia Zapata and Maria Teresa Zapata, Agent Nimmoor proceeded to search the carry-on luggage. Agents discovered forty thousand ($40,000) dollars in Maria Ofelia's luggage and twenty-five thousand ($25,000) dollars in Marie Teresa's luggage. Agent Estrada, fluent in Spanish, advised the Defendants of their Miranda rights.

7. As Estrada spoke to Defendants, Agent Ramirez asked Agent Jacobo to join them. Jacobo had been previously assigned the task of advising boarding passengers concerning the currency reporting requirements. Jacobo advised she had explained Form 503 through posters, handouts, and intermintent publications by a loud-speaker. She confirmed to Ramirez that Defendants had been explained Form 503 in Spanish. At that point, probable cause existed.[7]

8. After the Defendants waived their rights, Agent Estrada questioned Maria Ofelia Zapata. Defendant stated she earned the money. Estrada challenged the statement. Maria Ofelia Zapata admitted some money came from "friends" but would not identify them.

9. After completion of questioning, the Defendants were taken to the Customs' inspection office. At that point, agents took the claim stub for the checked baggage. The luggage was searched. Concealed currency was found in "Bengay" tubes, boots and even in baby wash clothes. In total, Customs seized over one hundred fifty thousand ($150,000) dollars.

10. At the Customs' enclosure, Agent Jacobo re-explained the Miranda rights. Each Defendant waived their right through a Miranda form. This second waiver confirmed the earlier oral relinquishment of rights. While being transported to the Women's Detention Center, Maria Teresa Zapata confirmed to Agent Jacobo her sister's statement that the money belonged partly to friends.

## ISSUES

Defendants Maria Teresa Zapata and Maria Ofelia Zapata move to suppress physical evidence and statements. Defendants argue that Customs violated their Fourth Amendment rights in seizing the luggage and contraband currency and additionally violated Fifth and Sixth Amendment rights in obtaining statements. Defendants cite to the authority of *United States v. Chemaly,* 741 F.2d 1346 (11th Cir.1984) and *United States v. Bacca-Beltran,* 741 F.2d 1361 (11th Cir.1984).

The Government responds that the initial conversations were nothing more than a contact encounter which ripened into permissible consent to search the luggage. The Government points out that "outbound" encounters between departing passengers and Customs Officers must be viewed as a "border exception" under the Fourth Amendment and this case is controlled by 31 U.S.C. 5317(b), amended 1984. Concerning the statements, the Government opines that the initial conversations were non-custodial; and, as to the subse-

**5.** *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *see, United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

**6.** *See, United States v. Jones,* 475 F.2d 723 (5th Cir.1977). A Court must go beyond a reported verbal consent to determine if consent was voluntary under all the circumstances. *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

**7.** *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); and, *United States v. Clark,* 559 F.2d 420 (5th Cir.1977).

quent custodial conversations, the Defendants waived their rights.

With this background, the issues are joined. In light of the nature of the legal issues presented, this Court will provide a review of the applicable law.

## CONCLUSIONS OF LAW

■ 1. The initial conversation between Customs and the Defendants was permissible either as a "contact encounter" between police and citizens, *United States v. Waksal,* 709 F.2d 653 (11th Cir.1983); and, *United States v. Berry,* 670 F.2d 583 (5th Cir.1982) (Unit B, en banc) [8]; or as "routine questioning at the border." [9] *United States v. Lezema-Hernandez,* 729 F.2d 310 (5th Cir.1984); and *United States v. Lueck,* 678 F.2d 895 (11th Cir.1982).

■ 2. This initial conversation between Customs Agents and the Zapata sisters ripened into a basis for consent to search the carry-on luggage of the Defendants. This Court concludes that the Government has carried its burden in establishing that Maria Ofelia Zapata and Maria Teresa Zapata freely and voluntarily consented to a search of the luggage. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); and *Schneckloth v. Bustamante,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In reaching this conclusion, this Court has given due consideration to the various factors elaborated upon in the findings rendered above. *See, Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ 3. Defendants contend that the warrantless search of the luggage mandates suppression because (a) a search warrant is required prior to a search of outbound luggage pursuant to *United States v. Chemaly,* 741 F.2d 1346 (11th Cir.1984) and *United States v. Bacca-Beltran,* 741 F.2d 1361 (11th Cir.1984); and (b) the search was not supported by probable cause and therefore unjustified. Each of these contentions are rejected.

Although *Chemaly* and *Bacca-Beltran* hold that a warrant was required for the search of the outbound luggage, those cases are not controlling, since their holdings were expressly limited to construction of the prior statute. That prior statute, 31 U.S.C. § 1105, (recodified as 31 U.S.C. § 5317 in 1982), stated that the Customs agents, "may", upon probable cause of a currency reporting violation, apply for a search warrant. *See,* 31 U.S.C. 1105 (1976). *Chemaly* and *Bacca-Beltran* held that the "warrant requirement" in that statute was not vitiated by the "border exception" for warrantless searches.

However, the current statute, in effect since October 12, 1984, states that a "Customs officer may stop and search, without a search warrant . . . a container or person entering or departing from the United States with respect to which or whom the officer has reasonable cause to believe" a currency reporting violation is occurring. 31 U.S.C. § 5317(b). [10]

The legislative history makes clear that the "reasonable cause to believe" standard is less than the previous "probable cause" standard. *See, United States v. Anaya,* 509 F.Supp. 289 (S.D.Fla.1980). Senate Report No. 225 states that the "Committee is fully convinced that such authority is not only needed, but constitutional, under the

---

**8.** "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *United States v. Waksal, supra,* at 658 citing *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

**9.** The applicability of border search cases to departing passengers is beyond question. *United States v. Ajlouny,* 629 F.2d 830, 843 (2nd Civ.1980).

**10.** 31 U.S.C. 5317(b) provides: "A Customs Officer may stop and search without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officers had reasonable cause to believe there is a monetary instrument being transported . . .".

line of cases holding that warrantless 'border searches' are reasonable even without probable cause under the Fourth Amendment." Senate Report No. 255, 98th Cong. 1st Sess., pp. 302–305 (1984), U.S.Code Cong. & Admin.News 1984, p. 3182.[11]

In this case, Agent Nimmoor obtained consent from the Defendants to search the carry-on luggage plus he had reasonable cause to believe a currency reporting violation was occurring due to the information provided by the confidential informant, reliance on the currency profile and inconsistent behavior and responses of the Zapatas. Accordingly, on either basis, the search of the carry-on luggage was proper. Moreover, the search of the Defendants' checked luggage located in the hold of the "airplane" was authorized under 5317(b) since, at that point, Customs had not only sufficient evidence to meet the reasonable belief standard but also probable cause with the discovery of the currency. Since no warrant was required, the physical evidence was not improperly obtained, and is admissible.

■ 4. Defendants further move to suppress their statements given to Customs officers. This argument is likewise without merit. On the admissibility of the statements, this issue can be divided into non-custodial and custodial. As to the initial conversation between Nimmoor and the Zapatas, prior to discovery of the money, this evidence is admissible because the federal setting was not custodial under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See, *United States v. Lueck*, 678 F.2d 895 (11th Cir. 1982). Each of these statements were made in response to routine questioning at the border, which is presumptively "noncustodial". See, *United States v. MacPherson*, 664 F.2d 69 (5th Cir. Unit B, 1981) (Miranda warnings not required during customs questioning at the border); and See, *United States v. Ledezma-Hernandez*, 729

F.2d 310 (5th Cir.1984). (Routine questioning at the border does not constitute custodial interrogation).

■ Once probable cause was established upon discovery of the currency, the Defendants were promptly advised of their Miranda rights by Agent Estrada in Spanish. This was appropriate since custodial status had now attached. *Miranda v. Arizona, supra;* and, *See, Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

At the Customs inspection office, Agent Jacobo re-explained the Miranda rights to the Defendants using a Miranda waiver form. This second written waiver confirmed the earlier oral relinquishment of rights. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In light of the record, it is beyond dispute that the Defendants made an intelligent and knowing relinquishment of their rights while in custody. Accordingly, all statements are admissible.

WHEREFORE, it is ORDERED and ADJUDGED as follows:

1. Defendants' Motion to Suppress Physical Evidence is *denied.*

2. Defendants' Motion to Suppress Statements is *denied.*

3. The constitutionality of 31 U.S.C. § 5317(b), both on its face and as applied, is *upheld.*

---

11. Defendants do not contest the constitutionality of a warrantless search at the border. The Constitution does not prohibit such searches, as Congress specifically recognized. *See,* Sen.Rep. No. 225, at 303. *See, also, United States v.*

*Ramsey,* 431 U.S. 606, 616–619, 97 S.Ct. 1972, 1978–1980, 52 L.Ed.2d 617 (1977); *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *United States v. Swarovski,* 592 F.2d 131, 133 (2nd Cir.1979).